Filed 8/11/26  In re J.L. CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| In re J.L. et al., | B351810 |
| Persons Coming Under the Juvenile Court Law. | (Los Angeles County Super. Ct. No. DK08393B,C) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
| Plaintiff and Respondent, | |
| v. | |
| J.L., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Juan M. Valles, Referee.  Affirmed.

William Hook, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Jacklyn K. Louie, Assistant County Counsel, and Peter Ferrera, Principal Deputy County Counsel, for Plaintiff and Respondent.

Father J.L. appeals from the juvenile court's order terminating his parental rights over his daughters Jo. and Ju. following a hearing pursuant to Welfare and Institutions Code section 366.26.[1]  He argues that the court erred by failing to apply the parental benefit exception to termination of his parental rights.  We find no error and therefore affirm.

BACKGROUND

I. *Initial Proceedings*

Father and mother, N.T., are parents to Jo., born in 2014, and Ju., born in 2016.  Mother also has an older daughter, A., born in 2007.[2]  When the family came to the attention of the Los Angeles County Department of Children and Family Services (DCFS) in 2015, mother and father were living together with A., Jo., and Ju.

A. *Referral and Petition*

On January 5, 2015, DCFS received a referral after mother brought 10-month-old Jo. to the emergency room.  Mother told a social worker that father had returned home early that morning smelling of alcohol and she confronted him about cheating on her.  When mother tried to leave with Jo., father kicked her and punched her in the face.  After mother and Jo. got into the car, father punched the car windows.  Mother returned home with Jo. later that morning and father pulled mother's hair, punched, and kicked her.  Mother was holding Jo. at the time, and one of father's punches caused

_____

[1]    Undesignated statutory references are to the Welfare and Institutions Code.

[2]    Father appeals only the termination of parental rights as to Jo. and Ju. Neither mother nor A.'s father are parties to this appeal.

2

mother's head to hit Jo.'s head, causing redness to Jo.'s face and redness and swelling to mother's head. Mother called the police and father was arrested.

Mother told DCFS that father was verbally abusive toward her and had been "tipsy" every day since Christmas 2014. Mother admitted keeping a bag packed so that when father got drunk and tried to fight, she could "just leave." A. told DCFS that father was "mean, and drunk" and had choked mother.

DCFS filed a dependency petition on behalf of A. and Jo. under section 300, subdivisions (a), (b)(1) and (j). The petition alleged that Jo. was at risk of serious physical harm due to the history of domestic violence between mother and father in Jo.'s presence and father's alcohol abuse, including while caring for Jo.

DCFS noted a prior incident in 2014 when father came to the hospital drunk after Jo. was born. Father fell asleep at mother's bedside. When mother attempted to wake him, he became angry and threw something at mother. In addition to his domestic violence arrests in 2014 and 2015, father's criminal history included several arrests and convictions for driving under the influence of alcohol (DUI).

At the detention hearing in January 2015, the juvenile court detained Jo. from father but released her to mother's custody. The court ordered monitored visits three times per week for father once he was released from custody.

B. *Jurisdiction and Disposition*

In an interview with DCFS in March 2015, father denied any domestic violence incidents with mother. He admitted to drinking beer two to three times a week, including around the children, but denied getting drunk.

3

Paternal grandmother reported that father completed an alcohol program after his DUI arrest in 2008, but continued to drink afterward.

In May 2015, the juvenile court sustained an amended version of the petition, including the allegations that mother and father engaged in physical altercations in Jo.'s presence and that father was under the influence of alcohol while caring for Jo. As for disposition, the court removed Jo. from father but allowed her to remain in mother's custody. The court ordered reunification services and twice weekly monitored visitation for father. Father's case plan included a drug and alcohol program and testing, a domestic violence program, and individual counseling.

As of the December 2015 status review report, father had partially completed a domestic violence program. Jo. continued to live with mother, while father had visitation with Jo. three times per week, monitored by maternal grandmother.

In March 2016, DCFS reported that father had not returned the social worker's calls. He also failed to submit to random drug tests. In May, father's domestic violence counseling program advised DCFS that father came to the facility under the influence and smelling of alcohol; he was resistant when asked to leave. The staff also reported a belief that mother and father were seeing each other, in violation of the restraining order against father. Mother and father denied this allegation.

C. *Additional Petitions*

Shortly after Ju. was born in August 2016, DCFS filed a petition on her behalf alleging that she was at risk from mother and father's failure to protect her siblings from their domestic violence and father's alcohol abuse.

4

The petition also alleged that shortly after Ju.'s birth, she and mother tested positive for amphetamine and that mother was a current user of that drug.

At the same time, DCFS filed a subsequent petition under section 342 for A. and Jo. under section 300, subdivision (b)(1). The petition alleged that mother used amphetamine during her pregnancy with Ju. Mother agreed to a safety plan to have A., Jo., and Ju. placed with maternal grandmother. The court extended father's three weekly monitored visits to include Ju.

Father had attended two sessions of a drug and alcohol counseling class. He admitted violating the restraining order and getting mother pregnant with Ju. In October 2016, father informed DCFS that he could not complete his drug and alcohol program because it was overwhelming to handle work and going to the program.

In October 2016, the court sustained the section 300 petition regarding Ju., including the allegations regarding domestic violence, father's alcohol use, and mother's drug use. The court also sustained the allegations of mother's drug use in the section 342 petition regarding Jo.


D. *Period of Review*

Father's substance abuse program terminated him in late October 2016 "due to his poor attendance pattern and lack of interest towards the program." Father told DCFS that he was tired of attending programs and could not afford to lose hours at his job to complete his court-ordered services.

At a hearing in November 2016, the court agreed to allow father six more months of family reunification services, but admonished him that his services could be terminated at the next hearing if he was not compliant. The court ordered Ju. to live with mother as long as mother stayed enrolled in an in-patient substance treatment program. Jo. remained in maternal

5

grandmother's care. Father stipulated to an updated case plan, including three weekly monitored visits, conjoint counseling with mother, a full drug and alcohol program, substance testing, and individual counseling.

DCFS filed a supplemental petition under section 387 in February 2017 as to Ju. after mother tested positive for methamphetamine. The court detained Ju. from mother and placed her back with maternal grandmother. The court sustained the supplemental petition in April 2017 and ordered father to continue to comply with his case plan.

In April 2017, father reiterated to DCFS that he had to focus on his work and his own needs because he wanted to "buy a better car" and "move to a bigger and better place." Father confirmed that mother was living with him. When asked if he was compliant with visitation, father stated, "I visited [*sic*] the children when I have the time, I love my children but for now, it is all about me first." Although DCFS explained to father the importance of completing his case plan in order to reunify with the children, he had not done so.

In July 2017, father requested a contested hearing as to termination of his reunification services. After father failed to appear for the hearing, the court terminated his reunification services as to Jo. Father failed to attend the next hearing in October 2017. The juvenile court found he had not complied with his case plan and terminated reunification services as to Ju.

E.    *Guardianship*

In December 2017, DCFS reported that the children were doing well in maternal grandmother's home. A. told DCFS that father visited them "but not all the time." In January 2018, DCFS reported that father had maintained "sporadic" contact through visits with Jo. and Ju. According to

6

maternal grandmother, father did not have a set visitation schedule, but just "shows up" to visit with the children.

The court held a permanency planning hearing for the children in April 2018. Father did not appear and his counsel stated that she had not been in contact with her office. The court granted legal guardianship of Jo. and Ju. to maternal grandmother and terminated jurisdiction.

II.     *Resumption of Jurisdiction*

A.     *Section 388 petitions*

After maternal grandmother died in April 2025, father filed a section 388 petition. He stated that Jo. and Ju. had been living with father and paternal grandfather for the past four months while maternal grandmother was sick. Father requested custody of the children or an order granting legal guardianship to paternal grandfather.

Maternal uncle, A.T., also filed a section 388 petition seeking to be appointed as legal guardian for the children. He stated that Jo. told him that on multiple occasions, father would get drunk or high on drugs and become violent with paternal grandfather.

The court reinstated jurisdiction and set both petitions for hearing. In June, DCFS reported that the children went to live with maternal uncle and his wife after maternal grandmother died. Jo. (now 11 years old) told DCFS that she thought living with maternal uncle and his family would be a "good thing" for her and Ju. She reported that she would visit father while they were living with maternal grandmother, and that father sometimes would drink alcohol and get into physical fights with paternal grandfather. Jo. stated that she was "scared about living with my dad because he drinks too much alcohol, and he fights with my grandpa. I want to live with my dad but

7

first he needs to get sober because he drinks a lot." Jo. enjoyed visiting father and paternal grandfather when father was not drinking, but when he was drunk, father was "mean to everyone, and it makes me scared." Jo. wanted father to get sober so she and Ju. "can visit with him more often and maybe we can go live with him when he gets sober. [¶] My preference would be to live with my dad, but I know I can't do that right now."

DCFS also spoke with Ju. (now 8 years old), who said that maternal uncle was nice and she was happy and felt safe living with him, his wife, and children. She also said that father would get drunk when she and Jo. visited and he would fight with paternal grandfather. She wanted to live with father, but said, "I know I can't because he needs to stop drinking and fighting."

Father told DCFS that he and paternal grandfather lived a few houses away from maternal grandmother. Father stated that he saw the children often while they were living with maternal grandmother, including picking them up from school and helping with homework. Father stated he was in recovery and no longer drinking and denied any physical altercations with paternal grandfather.

DCFS monitored a visit with father and paternal grandfather on May 31, 2025. The girls ran to greet father and gave him a hug. Paternal grandfather told the social worker that they had helped raise the girls with maternal grandmother. During the visit, the social worker observed the girls seemed comfortable and bonded with father and paternal grandfather. Father was physically affectionate with the girls and would often reach out to hold their hands.

After the visit, both girls expressed to the social worker how much fun they had and how much they had missed father and paternal grandfather. When asked who she would want to live with if she had a "miracle wish," Ju.

8

immediately said father and paternal grandfather, because father was sober. Jo. said she could tell when father was sober because he did not smile when he was drinking. Jo. said she did not know who she would want to live with.

DCFS provided an updated criminal history for father, including a conviction in March 2016 for disorderly conduct and intoxication, a DUI conviction in 2017, and two additional DUI arrests in 2017 and 2018. On June 4, 2025, DCFS asked father to participate in an on-demand drug and alcohol test but he said he could not make it that day or the next. Father met with DCFS on June 5, and he admitted he had consumed alcohol a few days earlier. He acknowledged that this was the reason he was avoiding the drug test and that he "had a slip up" and had taken some amphetamine. Father stated he had been "in and out of detox programs" and had "struggled with amphetamine" for the last three to four years. Father was trying to stay sober and wanted to regain custody of Jo. and Ju. He admitted that the girls had seen him intoxicated and argue with paternal grandfather one time. Contrary to the statements by Jo. and Ju., father denied any physical altercation or that the girls had ever "seen me falling or anything like that."

Following a hearing, the court denied father's section 388 petition. The court granted maternal uncle's petition in part, setting the matter for a permanent plan hearing. Paternal grandfather subsequently filed another section 388 petition seeking legal guardianship of the girls, which the court summarily denied.

B.    *Termination of Parental Rights*

In its next report, DCFS advised that on July 18, 2025, Jo. and Ju. were placed with paternal aunt, J.C., and her husband. The prior caregiver, maternal uncle, was unsure if he could meet the children's needs and also

9

stated that Jo. and Ju. had a closer relationship to paternal aunt. Paternal aunt was willing to adopt the girls and provide them permanency. Jo. and Ju. told DCFS that they wanted to be adopted by paternal aunt and her husband. They stated that they felt safe in the home and liked living there.

DCFS also reported that father had not visited consistently since the reinstatement of jurisdiction. In June, father cancelled one visit and did not respond to the social worker's attempts to schedule one the following week. Father did not respond to the social worker's calls or texts regarding visits in July. DCFS monitored visits on August 2 and 16, 2025. Father was affectionate and talked to the girls throughout the visit. Jo. and Ju. looked happy to be with father and paternal grandfather.

The social worker texted father to set up a visit the following weekend, August 26, but father responded that he wanted to have visits every other weekend. Father then cancelled the visit the following weekend. Paternal aunt told DCFS that father had attended two in person visits since the children were placed with her in July. Father had video and telephone calls with the girls multiple times per week. Jo. mostly initiated the calls and she was disappointed if father did not answer.

Father visited the children on September 6, 2025. After that, father told DCFS that he had started a new job and could not have visits for a few weeks. The next visit took place on October 4, 2025.

DCFS also submitted a report analyzing the applicability of the parental benefit exception to adoption. As detailed further below, this exception applies if a parent establishes that they have "maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) DCFS reported that father averaged one visit per month between the end of May and

10

beginning of October 2025. The barriers to more frequent visitation included the girls' schedule during the week, the distance to the caregivers' residence, father's lack of transportation, and his new job schedule. DCFS also noted father's failure to promptly respond to attempts to schedule visits, and father's cancellation or postponement of several visits.

Regarding the extent of a beneficial parent-child relationship, DCFS observed that father had been present in the children's lives while they lived with maternal grandmother, and that during visits Jo. and Ju. were affectionate and comfortable with father. However, DCFS also noted the negative interactions with father due to his substance abuse struggles. Both Jo. and Ju. did not want to live with father while he was drinking and felt scared and unsafe, having witnessed father's angry and violent behavior while drunk. As for the children's needs, DCFS reported that Jo. was struggling educationally and was behind in school. Father had not been able to provide the stability or safety they needed. DCFS opined that Jo. and Ju. had positive emotional affection for father, "as if he were a visiting uncle," but not a significant parent-child attachment. In addition, the girls were bonded to paternal aunt, her husband, and their children. They transitioned smoothly to paternal aunt's home and all of their needs were being met. Thus, DCFS concluded that the relationship with father would not outweigh the security offered by an adoptive home.

At the next hearing on November 3, 2025, the court ordered DCFS to submit an additional report focused on the relationship between father and the children. Father requested more visitation with the children. The court reiterated the prior order of three visits per week, but ordered DCFS to meet with father to develop a revised visitation schedule.

11

After DCFS contacted father to develop a revised visitation schedule, father told the social worker on November 12 that he did not want to set a more consistent schedule, he just wanted some longer visits. He completed a two-hour visit with the children on November 22.

In November, DCFS reported that Jo. and Ju. continued to thrive with paternal aunt and her family. Paternal aunt provided support for their medical, emotional, and educational needs and the girls had developed a stable and healthy attachment to the family. Jo. and Ju. both required extensive dental treatments due to prior neglect, and Jo. also was receiving additional academic tutoring as she was several grade levels behind in math. Both girls were also scheduled for weekly therapy sessions and their caregivers had enrolled them in sports and extracurricular activities.

Jo. told DCFS she felt good about adoption and would feel that way even with no further visits with father, because paternal aunt "doesn't do drugs and I feel safe here and father does drugs and alcohol." Ju. stated she liked living with her current caregivers and felt safe.

In November, father told paternal aunt that he preferred guardianship to adoption because he might be sober and able to regain custody in three years. Paternal aunt reported that this comment deeply upset Jo. and she had a "rough week" afterward, as she wondered, "why in three years, why not now, why not in the past 10 years?" Jo. expressed sadness, anger, and frustration when father stated he was "fighting for them" but continued to struggle with sobriety.

In a December 19, 2025 last-minute information, DCFS reported that father had not requested any visits for the past month. Ju. told DCFS that she felt "not so close" to father because "I barely see him." Ju. said she thought of father every day and missed him. But she looked to paternal aunt

12

for comfort and safety. A few weeks later, Ju. told DCFS that she was sad she could not see father more often and frustrated that "he puts bad stuff in his body." She felt joyful living with paternal aunt, but still worried about father. Ju. expressed that she loved father and felt sad that if she was adopted, he "isn't going to be my dad anymore," but she also loved living with paternal aunt.

Jo. stated she felt close to father only when he was not drinking. She thought of father often, wondering when he was going to stop drinking. Jo. stated she did not feel very safe with father, because "when he's not sober, I can't trust him." Jo. told DCFS that she felt hurt and disappointment toward father. She sent father a long text in November asking father to please stop drinking so that he could be in her life, but father had not responded. Jo. stated that she loved father but "he wasn't like a real dad." Paternal aunt stated that during the week the girls did not talk about father or ask about visits, and when they did talk about father it caused them "great stress and emotional confusion."

The court held the permanency planning hearing on January 5, 2026. Counsel for DCFS and counsel for the children asked the court to terminate parental rights. Counsel for the children acknowledged that they loved father, but "they have been very frustrated that father has not been able to maintain his sobriety and visits have been inconsistent." Counsel for father argued that the parental benefit exception applied, as he had been visiting the children as much as he was able. He argued that the children loved and were bonded to father, and it would not be in their best interest to sever that bond. He requested legal guardianship rather than adoption.

The court found by clear and convincing evidence that Jo. and Ju. were adoptable. Turning to the parental benefit exception, the court found that

13

father had not maintained regular visitation "to the extent allowed by court order." The court noted that DCFS had made efforts to set up a more consistent visitation schedule, but father had not been responsive to those efforts. As to father's bond with the children, the court found that it could consider the children's perception of father's sobriety and concluded that the children's "relationship with their father is not a healthy one. At almost every contact the minors are distraught and overcome with anxiety and even resentment." While Jo. and Ju. loved father, on balance, "they seem to be emotionally harmed" by the relationship. The court also found that the children were thriving in the care of paternal aunt and her husband. Having concluded that no exceptions applied, the court terminated father's and mother's parental rights. The court ordered adoption as the permanent plan and designated paternal aunt and her husband as the prospective adoptive parents.

Father appealed from the court's order terminating his parental rights.

DISCUSSION

Father contends that the juvenile court erred in finding he had not met the requirements of the parental benefit exception as to Jo. and Ju. We find no error.

I.    *Legal Principles*

A.    *Parental Benefit Exception*

The express purpose of section 366.26 is "to provide stable, permanent homes" for dependent children. (§ 366.26, subd. (b).) After reunification services are terminated, adoption is the legislative preference. (§ 366.26, subd. (b)(1); see also *In re Celine R.* (2003) 31 Cal.4th 45, 53 (*Celine R.*)

14

["'Adoption is the Legislature's first choice because it gives the child the best chance at [a full] emotional commitment from a responsible caretaker'"]) Thus, once the juvenile court finds the child is adoptable, "the court must order adoption and its necessary consequence, termination of parental rights," unless a parent can establish one of the exceptions set forth in section 366.26, subdivision (c). (*Celine R., supra*, 31 Cal.4th at p. 53; see also § 366.26, subd. (c)(1); *In re Caden C.* (2021) 11 Cal.5th 614, 625 (*Caden C.*).) These statutory exceptions "merely permit the court, in *exceptional circumstances* [citation], to choose an option other than the norm, which remains adoption." (*Celine R., supra*, 31 Cal.4th at p. 53; see also *In re A.L.* (2022) 73 Cal.App.5th 1131, 1150.)

Father seeks to apply the parental benefit exception, which permits the selection of another permanent plan if a parent has "maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) As detailed in *Caden C., supra*, 11 Cal.5th at page 631, a parent must prove three elements to establish the parental benefit exception.

First, the parent asserting the exception must show "regular visitation and contact with the child, taking into account the extent of visitation permitted." (*Caden C., supra*, 11 Cal.5th at p. 636.) This element is "straightforward," involving an assessment of whether the parent visits consistently. (*Id.* at p. 632.)

Second, the parent must show that "the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship." (*Caden C., supra*, 11 Cal.5th at p. 636.) In assessing whether the child would benefit from continuing the relationship with the parent, "the focus is the

15

child.  And the relationship may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.'" (*Id.* at p. 632.)

Third, the parent must show that terminating the parent-child attachment "would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home." (*Caden C., supra*, 11 Cal.5th at p. 636.)  "[C]ourts must assume that terminating parental rights terminates the relationship.  [Citations.]  What courts need to determine, therefore, is how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life." (*Id.* at p. 633.)  This evaluation consists of a "subtle, case-specific inquiry[,]" including consideration of whether "the benefit of placement in a new, adoptive home" outweighs the harm the child "would experience from the loss of [a] significant, positive, emotional relationship" with the parent.  (*Ibid.*)  In making this detriment determination, the juvenile court does "not look to whether the parent can provide a home for the child," and "is not comparing the parent's attributes as custodial caregiver relative to those of any potential adoptive parent(s)." (*Id.* at p. 634.)

B.    *Standard of Review*

We apply a mixed standard of review to a juvenile court's findings regarding the parental-benefit exception.  The first two elements—regular visitation and a beneficial relationship—involve determinations that are essentially factual; we therefore review those findings for substantial evidence.  (*Caden C., supra*, 11 Cal.5th at p. 640.)  The third element requires

16

the juvenile court to determine whether any harm the child would suffer from the severance of the parental bond would outweigh the benefit to the child of adoption. (*Ibid*.) As with the first two elements, the juvenile court must make a series of factual determinations including determinations about the child's relationship with a parent, which we review for substantial evidence. (*Id*. at p. 640.) However, "the ultimate decision—whether termination of parental rights would be detrimental to the child due to the child's relationship with his [or her] parent—is discretionary and properly reviewed for abuse of discretion." (*Ibid*.)

The juvenile court here found that father did not meet his burden of proving the exception. In such a case, where the trier of fact has "expressly or implicitly concluded that the party with the burden of proof did not carry the burden and that party appeals," we determine whether the evidence compels a finding in father's favor as a matter of law, asking whether that evidence was uncontradicted and unimpeached and of such a character and weight as to leave no room for a judicial determination it was insufficient to support a finding. (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528, disapproved on other grounds by *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7.)

II.    *Analysis*

The juvenile court found that father met none of the three elements for the parental benefit exception under *Caden C.* We find no error in that conclusion.

For the first element, the court found that father failed to establish that he had regularly visited Jo. and Ju. "Regular visitation exists where the parents visit consistently and to the extent permitted by court orders." (*In re*

17

*I.R.* (2014) 226 Cal.App.4th 201, 212; see also *Caden C.*, *supra*, 11 Cal.5th at p. 632; *In re J.D.* (2021) 70 Cal.App.5th 833, 852 ["'The parent must show regular visitation and contact with the child, taking into account the extent of visitation permitted'"].)  Father did not meet his burden to establish either that he visited consistently or to the extent permitted by the court.  Father's visitation was sporadic throughout the case.  In 2017, he told DCFS that he needed to focus on himself and visited the children when he had time.  Statements from the children suggested that father visited inconsistently and maternal grandmother reported that he did not have set schedule, but would show up when he wanted to visit.  Father contends that he saw the children frequently during the seven-year period when maternal grandmother had legal guardianship.  However, once the court reinstated jurisdiction in 2025, father's visitation decreased to an average of one visit per month.  He did not respond to the social worker's attempts to schedule visits and several times cancelled or postponed a visit.

Even after the court granted his request to discuss additional visitation, father told DCFS that he wanted some visits of longer duration, but not an increase in frequency.  Although father was entitled to three visits per week, he never sought a set visitation schedule and visited much less frequently than permitted.  Under these circumstances, the record does not compel a finding in father's favor that he maintained consistent visitation with Jo. and Ju. to the extent he was permitted by the court.

Because father was required to establish all three elements of the exception, his failure to establish regular visitation is fatal to his claim.  (See *In re I.R., supra*, 226 Cal.App.4th at p. 212; *In re Katherine J.* (2022) 75 Cal.App.5th 303, 322, fn. 10 ["[A] parent must prove *all three* components of the beneficial relationship exception"].)  Thus, we need not consider the

18

remaining two elements. However, even if we did, we would affirm the juvenile court.

The second element required father to establish that Jo. and Ju. had a "substantial, positive, [and] emotional attachment" to him. (*Caden C., supra*, 11 Cal.5th at p. 636.) "A positive attachment between parent and child is necessarily one that is not detrimental to the child but is nurturing and provides the child with a sense of security and stability." (*In re B.D.* (2021) 66 Cal.App.5th 1218, 1230.) Father argues that the evidence does not support the court's finding that there was no substantial positive attachment between him and the children. But he cannot show, as he must, that the evidence was " 'uncontradicted and unimpeached' and … 'of such a character and weight as to leave no room for a judicial determination it was insufficient to support a finding.' " (*In re I.W., supra*, 180 Cal.App.4th at p. 1528.) It was undisputed that the girls had an attachment to father. Jo. and Ju. expressed that they loved father and wanted to spend time with him. But the court was also entitled to consider the significant evidence that the relationship had negative effects on the children. Jo. and Ju. expressed their anger, frustration, and concern over father's longtime struggles with sobriety and stated that they did not feel safe with father when he was drinking. While the court could not consider father's fitness for return of custody at this stage, father's continued struggles with substance use were relevant "to the extent they inform the specific questions before the court: would the child benefit from continuing the relationship and be harmed, on balance, by losing it?" (*Caden C., supra,* 11 Cal.5th at p. 638.) Thus, the court could take into account the evidence that father's inability to stay sober negatively affected his relationship with Jo. and Ju.

Moreover, the court could consider that father had not had custody of Jo. since shortly after she was born, and had never had custody of Ju. The girls required extra support including extensive dental work, academic support, and therapy, all of which they received from paternal aunt, and they looked to her for safety and comfort. (See *Caden C., supra,* 11 Cal.5th at p. 632 [considering factors including the portion of the child's life spent in the parent's custody and the child's particular needs].) Although both girls loved father, they expressed their desire to stay with paternal aunt and her family and to be adopted by them. Father's argument that the court should have weighed more heavily the positive aspects of his relationship with his daughters cannot meet his burden on appeal. He has not shown that the evidence compelled a finding that he had the strong positive bond with Jo. and Ju. required to apply the parental benefit exception.

Similarly, we find no error in the juvenile court's conclusion as to the third element, i.e., that father did not establish that terminating his relationship with Jo. and Ju. would outweigh the benefits of adoption. Despite the trauma of losing their longtime caregiver maternal grandmother, the girls adjusted easily to their new home with paternal aunt, expressing that they felt safe and loved in their care. Paternal aunt and her husband were devoted to providing a permanent home for the girls and ensuring their needs were met. The importance of stability and permanency to be gained from adoption is strong here, where the children endured several placement changes over the ten-year course of this case. Thus, it was not an abuse of discretion for the court to conclude that the benefits of allowing the girls' adoption by their loving caregivers to whom they were bonded outweighed any detriment from terminating father's parental rights.

DISPOSITION

The order terminating father's parental rights over Jo. and Ju. is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


COGLIATI, J.*

We concur:


ZUKIN, P. J.


MORI, J.

---

*Judge of the Santa Cruz Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.